**BOWMAR INSTRUMENT CORPORATION, Plaintiff-Appellant,**

v.

**ALLIED RESEARCH ASSOCIATES, INC., Defendant-Appellee.**

No. 3–976A221.

Court of Appeals of Indiana, Third District.

Aug. 1, 1979.

Robert L. Thompson, Jr., C. David Peebles, Peebles, Thompson, Rogers & Hamilton, Fort Wayne, for plaintiff-appellant.

William L. Sweet, Jr., Barrett, Barrett & McNagny, Fort Wayne, for defendant-appellee.

GARRARD, Presiding Judge.

■ Bowmar Instrument Corporation (Bowmar) sued Allied Research Associates, Inc. (Allied) to recover on a contract to produce parts for a government contract. The trial court found against Bowmar, and it appeals from that negative judgment. Accordingly, to sustain its appeal Bowmar must establish that the evidence led to but one conclusion and the court reached an opposite conclusion. *Barrow v. Weddle Bros. Const.* (1974), 161 Ind.App. 601, 316 N.E.2d 845, 854.

In July 1972, Allied was awarded a contract by the United States government to manufacture manpack portable radar systems for the Army. The award was subject to certain regulations, including Armed Services Procurement Regulations and a "first articles requirement." This requirement provided that Allied had to submit eleven "first articles," or what might loosely be termed samples, to the government for inspection, testing and approval. Any costs expended in production beyond the first articles requirement were undertaken at the contractor's risk until the first articles were approved.

One of the Armed Services Procurement Regulations to which the contract was subject provided for payments to be made to the contractor for work in progress. The contractor was to submit billings to the government for its work and could bill for costs incurred by subcontractors for completed work. However, Allied could not bill for production items until first article approval was secured.

Allied entered into negotiations with Bowmar for the manufacture of azimuth counters and other components of the radar system. Allied chose to negotiate with Bowmar and some other manufacturers because it felt they would be willing to work on the project despite the fact that Allied was in financial difficulty. During the course of the negotiations Allied's financial condition was explained to Bowmar and it was made clear that Allied could pay for production items (as well as first articles) only from progress payment funds it received for the government. Bowmar refused to reduce the cost of part of their components by substituting plastic for the metal parts specified in the government contract.

By a letter dated February 13, 1973, Allied awarded the contract for the azimuth counters and related components to Bowmar. Several days later, Bowmar shipped Allied two metal counters from parts it had in stock. In mid-April, Allied sent Bowmar formal purchase orders which detailed the terms of the agreement. The purchase orders stated that fifteen first articles were to be delivered to Allied in May. That would allow Allied to test them and integrate them into the radar system in time to meet the first articles requirement deadline of October 12. The purchase orders then called for delivery of 60 units a month beginning in August until 600 units were

" . . . delivered in accordance with Clause # 1 stated below and after first article approval." Clause # 1 extended deliveries over a three-year period and limited deliveries in the first year of the contract to 600 units. The progress payments clause of the order contained the following paragraph:

"3.4 Prior to approval of first articles, the acquisitions of materials or components for, or the commencement of production of, the balance of the contract quantity shall be at the sole risk of Bowmar Instruments Corp. and costs incurred on account thereof shall not be allocable to this contract (1) for the purpose of progress payments prior to approval of the first article, if this contract contains the clause entitled 'Progress Payments' or (11) for the purpose of termination settlements, if this contract is terminated for the convenience of the government prior to approval of the first articles."

Bowmar insisted that this paragraph be deleted, stating that its position was:

" . . . that in the event of termination, all costs incurred in the performance of the subject purchase orders, plus a reasonable allowance for profit is payable in full."

Allied agreed to the deletion.

Bowmar did not deliver any of the first articles in May due to problems with its supplier. In July, Allied and the government rescheduled the deadlines for first articles and production items and Bowmar was notified. Nonetheless, Bomar began production, and in November began billing Allied for progress payments. When no payments were forthcoming Bowmar threatened to suspend production. Allied replied by letter that Bowmar's billing appeared to reflect production costs as well as first article costs, and asked that an audit be conducted. Representatives from Allied and Bowmar met and Allied insisted it needed the first articles before production costs could be paid. Allied did pay Bowmar a portion of the amount claimed to be due. Delivery dates were again rescheduled for production units. In June 1974, the govern-

ment terminated its contract with Allied on the ground that Allied had made insufficient progress toward completion of the first articles requirement. In making its decision, the government gave no consideration to completed production items; it was concerned only with first articles. At the time of termination, Bowmar had delivered to Allied some but not all of the first articles, with respect to certain components, and more than first articles with respect to other components.

Bowmar sued to recover damages for Allied's failure to pay for the items delivered. The trial court entered a general finding for Allied, and therefore we have no way of knowing precisely what motivated its decision. However, it is the duty of this court to sustain the decision below on any theory which is supported by the evidence. *Montgomery Ward & Co., Inc. v. Tackett* (1975), 163 Ind.App. 211, 323 N.E.2d 242, 247.

At trial, Bowmar argued that by agreeing to the deletion of Paragraph 3.4, Allied agreed to pay for production items regardless of whether first article approval was ever received. However, Bowmar's stated objection to Paragraph 3.4 was simply that upon termination the costs it incurred were to be paid. Allied's assent need not be read as an agreement to pay production costs because retention of the delivery clause, which stated delivery of production items was to follow first article approval, made it clear that only first articles could be paid for until approval was received.

Moreover, even if Bowmar's interpretation of the deletion of the progress payments paragraph were to be accepted, the evidence shows that Bowmar may not recover because it has failed to prove an essential element of its case.

"[G]enerally . . . where one seeks recovery of damages from another whom he alleges has violated the terms of a mutual contract, . . . the plaintiff must both allege and prove that he has himself performed or offered to perform the terms of the contract." *Clark Mutual Life Insurance Co. v. Lewis*

(1966), 139 Ind.App. 230, 217 N.E.2d 853, 857.

Bowmar was to produce 15 first articles of seven components. As to four of these components it delivered only three; only one of the three had plastic parts. Bowmar did deliver substantially more of the remaining components, but since they were not interchangeable with the undelivered ones, Allied could not use the excess parts to compensate for the deficient ones in order to manufacture first articles.

■ In view of these facts, the trial court could find that Bowmar did not perform fully or substantially. Bowmar knew Allied had to deliver first articles in order to receive government approval and payment for production beyond that point. Moreover, it knew the government contract called for metal parts and, therefore, the substitution of plastic parts gave an added dimension to approval. There can be no question that delivery of first articles was of critical importance to the contract with Allied. Bowmar's breach went to the essence of the contract and bars its recovery.[1] 6 I.L.E. *Contracts* § 228; Corbin on Contracts (1975 Ed.) §§ 770 ff. Additionally, under the Uniform Commercial Code upon which Bowmar relies, the duty to pay arises only upon proper tender. White & Summers, *The Uniform Commercial Code* (1972), p. 95. Bowmar failed to make such a tender by not delivering within the time called for or at any time thereafter.

■ Moreover, the fact that Allied did not place Bowmar in default for its failure to tender the first articles does not, under the circumstances here, amount to a waiver of Bowmar's breach. An Armed Services Procurement Regulation required Allied to assess the effect placing a subcontractor in default would have on Allied's ability to deliver to the government on schedule. Had Bowmar been placed in default, Allied's schedule would have been set back as much as 15 months. Defaulting Bowmar was not a commercially reasonable alternative. Therefore, Allied opted for repeated requests for performance in the hope that Bowmar would be able to deliver in time to defeat an attempt by the government to terminate the contract. Bowmar's failure to do so defeated its right to recovery.

Affirmed.

HOFFMAN, J., concurs.

STATON, J., concurs in result.

---

1. Bowmar was not the only subcontractor to fail to deliver first articles, and its role was limited to 3% of the entire undertaking by Allied. However, had it fully performed, Allied would have been 2½% to 5% closer to the standard of "sufficient progress." There was testimony that such a percentage would have helped considerably to save the contract for Allied.